# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00342-CV

---

### R. M., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 316,896-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

R.M. (Mother) appeals from the trial court's final order terminating her parental rights to her daughter A.H., who was removed from her parents' care in March 2020 after the Texas Department of Family and Protective Services (Department) received a report alleging physical neglect and neglectful supervision related to incidents of domestic abuse and illegal drug use.[1] After a hearing, an associate judge determined that termination of Mother's parental rights was in A.H.'s best interest and that Mother knowingly placed and allowed A.H. to remain in conditions and surroundings that endangered her physical and emotional well-being, knowingly placed A.H. with individuals who engaged in conduct that endangered her physical and emotional well-being, and failed to comply with the provisions of a court order establishing the actions necessary for Mother to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(D),

---

[1] To protect the child's privacy, we will use the child's initials when referring to her and will refer to her family members by their relationships to her. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Although Father's rights were also terminated, he is not a party to this appeal.

(E), (O), (b)(2). Following this ruling, Mother sought a de novo hearing regarding the best-interest determination. *See id.* §§ 201.015, .2042. At the time of the de novo hearing, A.H. was seven years old. After the de novo hearing, the trial court issued a decree terminating Mother's parental rights and finding that termination is in A.H.'s best interest. On appeal, Mother contends that the trial court's best-interest determination is not supported by legally or factually sufficient evidence. We will affirm the trial court's order.

**BACKGROUND**

During the de novo hearing concerning Mother's parental rights to A.H., Mother and an employee for the Department, Sherri Duirden-Jones, both testified, and the trial court admitted into evidence the removal affidavit prepared by a Department employee, the family service plan, and the Department's final report regarding the status of the case.

In the removal affidavit, a Department investigator averred that on March 25, 2020, the Department received a report alleging physical neglect and neglectful supervision of A.H., that there were methamphetamine "baggies" and multiple drug pipes in the home, and that Mother was using methamphetamine and appeared hostile to A.H. In addition, the investigator explained that she went to Mother's house the following day and observed bruises on Mother's face and arms, which Mother explained were caused by Father punching her during an argument. Further, the investigator related that Mother admitted that "the violence between her and [Father] started a few months ago" and that the police had already obtained a protective order after she called 911 to report the abuse. The investigator also stated that the protective order went into effect March 10, 2020, and would expire on May 10, 2020, and that a police report for a prior incident stated that Father punched Mother in the face and pushed her into a bathroom door, that

2

Mother had a bloody and bruised face, and that Mother had older injuries that she admitted were from an earlier assault by Father.

The removal affidavit also documented a subsequent visit by another investigator. In particular, the affidavit stated that the investigator went to the home because Mother's landlord called in early April 2020 to report that Father had been living in the home for a week even though there was a protective order in place and that there was "yelling coming from inside the home." When the investigator talked with Mother, she denied seeing Father, but the investigator later found Father in the bedroom and confirmed his identity. When the investigator asked Mother why Father had been living at the home, Mother explained that she had been with Father since middle school and inquired what was she "supposed to do?" Further, the investigator talked with A.H., who stated that her parents fight "with their hands a lot," that Father hits Mother, and that she has seen Mother with blood on her face. Additionally, the affidavit stated that Mother admitted that she was "doing Methamphetamines with [Father] in their home where [A.H.] lives" and that Mother tested positive for methamphetamine and amphetamines in April 2020.

The service plan for Mother from May 2020 required her to have supervised visits with A.H., submit to weekly drug testing, submit to a substance-abuse assessment, have a psychological evaluation, and participate in counseling. The plan also listed the Department's concern that Mother will continue using illegal drugs and prohibited Mother from using illegal drugs and from associating with individuals engaged in illegal activities. The plan detailed the Department's concerns that Mother will continue to be involved in an abusive relationship with Father, which had resulted in "significant injuries" to Mother.

3

The final report from March 2021 detailed that Mother had participated in weekly therapy sessions, had been discharged from therapy, and had submitted to weekly drug testing but had not participated in a psychological evaluation. Further, the report documented that Mother tested positive for cocaine in January 2021, admitted that she went to her brother's house and learned that his roommate uses cocaine, and stated that she had sex with someone who she later learned was using cocaine. In addition, the report stated that Mother "rekindled her relationship with" Father in June 2020; that Father subsequently assaulted Mother, which resulted in her suffering a black eye and his being arrested; and that Mother requested that the charges against Father be dropped. Further, the report chronicled that A.H. told the Department that Father "taught her how to kill herself by cutting her wrists." Moreover, the report documented that Mother had moved into a new home, that the caseworker noticed some of Father's belongings in the new home in September 2020, and that the caseworker did not see Father's belongings in the home in November 2020.

Additionally, the report indicated that Mother is now employed with a senior healthcare company, lives in a clean apartment that has a room for A.H., and has positive visits with A.H. for which she "provides snacks, arts and crafts." The report also stated that Mother's substance-abuse assessment from July 2020 indicated that substance-abuse treatment was not needed. However, the report also documented the Department's concerns that Mother continues to associate with individuals who use illegal drugs and to be in a relationship with Father even though it exposes her to violence and drug use in the home and even though A.H. was "traumatized by the abuse that she witnessed while in the care of her parents."

At the de novo hearing, Duirden-Jones testified that she works for the Department and that the Department recommended that Mother's parental rights be terminated. In her

4

testimony, Duirden-Jones explained that although Mother complied with the directive to submit to drug testing, she tested positive for cocaine in January 2021, which was after A.H. had been removed from her custody. Further, Duirden-Jones discussed how Mother had a problem with drugs and tested positive for methamphetamine and amphetamines early in the case. In addition, Duirden-Jones testified that the Department had concerns that A.H. would continue to be exposed to domestic abuse because Mother got back together with Father after A.H. had been removed, leading to an incident of domestic abuse within a week and resulting in injuries to Mother's face, and because Mother was trying to get the charges against Father stemming from that incident dropped. Duirden-Jones described the domestic abuse as "very significant and very severe."

In addition, Duirden-Jones discussed how when she went to Mother's new home in September 2020, she saw Father's clothes hanging in the closet, which she thought was unusual because Mother had recently moved in and had not unpacked all of her own belongings; however, Duirden-Jones also testified that Mother stated Father's relative was going to pick up the clothes from the home. Duirden-Jones related that although Mother denied still being involved with Father during the visit, Mother received a phone call from someone nicknamed "My Hubby" in the contacts on her phone and later admitted that the caller was Father. Further, Duirden-Jones explained that Mother was not honest about her involvement with Father, that Father called and texted during other visits, and that one text from Father stated that he was waiting for Mother in the parking lot next to the Department. Moreover, Duirden-Jones testified that Father is currently in jail and that Mother would likely be with Father if he were not in jail.

Additionally, Duirden-Jones stated that Mother had partially complied with the family plan by having visits with A.H. and by participating in drug testing, counseling, and a

5

substance-abuse assessment. Duirden-Jones also noted that Mother had been discharged from individual counseling and that the substance-abuse assessment indicated that no additional services were needed at the time of the assessment. Further, Duirden-Jones testified that Mother's home was clean and had a room for A.H. and that Mother maintained employment during the case.

Regarding A.H., Duirden-Jones testified that she is currently in a foster home with parents who are planning to adopt her. Although Duirden-Jones explained that A.H. had only been in the home for a few weeks and had been transferred to this new foster home because she started acting out by lying and stealing, Duirden-Jones also related that A.H. is currently in therapy for those issues, that the issues can be successfully treated in therapy, and that the Department will be able to transition A.H. to a forever home. Regarding Mother's visits with A.H., Duirden-Jones explained that Mother would bring activities for them but allowed A.H. to do whatever she wanted and acted more like a friend than a parent.

After Duirden-Jones finished testifying, Mother was called to the stand. In her testimony, Mother admitted that she called the police about an act of abuse in March 2020 in which Father slammed her into a wall and punched her eye and that A.H. was in the home at the time. Similarly, Mother testified about two incidents later the same month. In the first, Father punched her and threw her to the ground, causing her to sustain injuries from that assault. In the second, Mother called the police after Father punched her in the face again. Mother admitted that A.H. was in the home during the second incident, clarified that she "never said [A.H.] was safe" from the abuse, and acknowledged that witnessing the violence hurt A.H. Mother described another incident of abuse in June 2020 after A.H. had been removed from the home in which she stated that one week after she got back together with Father, he punched her and "gave

6

[her] a black eye." Mother testified that she subsequently moved into her own place, changed her phone number, and did not tell Father where she moved. When discussing her drug-test results from January 2021, Mother stated that she believes she tested positive because she had sex with someone who used cocaine.

Additionally, Mother testified that she is currently employed with two senior healthcare companies while she attempts to get a nursing assistant's license, makes enough money to support A.H. and herself, owns her own car, completed most of the requirements of the service plan, never missed a visit with A.H., and will never again risk a positive drug result by interacting with people who use drugs. When describing her visits with A.H., Mother related that the visits went well. Additionally, Mother testified that termination of her parental rights was not in A.H.'s best interest, that A.H. wanted to come home, and that A.H. started misbehaving while in foster care.

Regarding her relationship with Father, Mother related that she is no longer involved with him, does not want to be involved with him again, and had no further contact with him after the time that he called her on the phone while Duirden-Jones was at her home for a visit. Further, Mother admitted that she had hung a few of Father's shirts in a closet in her new home but explained that she had packed them from her prior home and that the clothes were gone by the next time that someone from the Department visited. Moreover, Mother admitted that Father did text her to say that he was waiting for her in the parking lot next to the Department but explained that she did not have a car at the time and that Father's mother was picking her up. Mother also admitted that she had visited Father while he was in jail on at least three occasions to tell him when the trial date was, to tell him about her decision to request a de novo hearing, and to tell him when the de novo hearing was scheduled.

7

After considering the evidence presented at the hearing, the trial court determined that termination of Mother's parental rights was in A.H.'s best interest and rendered a de novo decree terminating her parental rights. Mother appeals the trial court's order.

## STANDARD OF REVIEW AND GOVERNING LAW

The Family Code allows a trial court to refer to an associate judge "any aspect of a suit over which the court has jurisdiction." Tex. Fam. Code § 201.005. An associate judge may conduct a hearing, hear evidence, make findings of fact, formulate conclusions of law, and recommend that an order be rendered. *Id.* § 201.007; *see also id.* § 201.204 (setting out powers of associate judge). After an associate judge makes a recommendation, any party may request a "de novo hearing before the referring court" but must specify the issues that will be presented to the referring court. *Id.* § 201.015(a)-(b). Accordingly, de novo hearings are limited to the specific issues stated in the hearing request. *In re A.L.M.-F.*, 593 S.W.3d 271, 276 (Tex. 2019).

To terminate an individual's parental rights, the Department must prove by clear and convincing evidence that the parent engaged in conduct listed as a statutory ground for termination in the Family Code and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. When reviewing a termination order, appellate courts defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

8

In legal-sufficiency reviews, appellate courts consider undisputed evidence contrary to the finding at issue but assume that the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). The evidence is legally sufficient "if, viewing the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. In contrast, for factual-sufficiency reviews, appellate courts weigh the disputed evidence contrary to the finding against the evidence supporting the finding and ascertain whether a reasonable factfinder could have weighed the conflicting evidence in favor of the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

The best-interest prong "is child centered and focuses on the child's well-being, safety, and development." *Id.* This determination is guided by multiple non-exclusive factors, including the following: (1) the child's wishes; (2) the child's physical and emotional needs; (3) the physical and emotional danger to the child now and in the future; (4) the parental ability of the person seeking custody; (5) programs available to help that person; (6) the plans for the child by that person or the agency seeking custody; (7) the stability of the home; (8) the parent's acts or omissions indicating that the parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Evidence pertaining to a statutory ground for termination may also be probative of the best-interest prong. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). The Department need not prove all the factors, and the absence of evidence for some of the factors does not preclude a finding that termination is in

the child's best interest. *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

## DISCUSSION

In her sole issue on appeal, Mother contends that the evidence is legally and factually insufficient to support the trial court's best-interest determination. As support for that argument, Mother asserts that only limited evidence was presented regarding A.H.'s desires and present and future needs, highlights testimony from Duirden-Jones indicating that Mother brought toys and activities during her visits, and references the portion of the final report stating that the visits went well. Moreover, Mother argues that she presented no signs of a present or potential future drug problem because most of her drug tests were negative, indicating that she was sober for months during the pendency of this case, and because the substance-abuse assessment showed no need for substance-abuse treatment. Relatedly, Mother emphasizes her testimony in which she denied using cocaine and reasoned that she must have tested positive because she was in close contact with an individual who used cocaine and notes that the Department never referred her to additional services after the positive result. Further, Mother points to her testimony describing her efforts to stay away from Father, including moving into her own place and changing her phone number after he abused her in June 2020, and stating that she has no intention of being involved with Father ever again or subjecting herself to his abuse. When discussing her interactions with Father, Mother also refers to her testimony in which she explained that her therapist recommended communicating with Father to establish a co-parenting relationship. Additionally, Mother notes that her new apartment is clean and has a room for A.H., that she has been consistently employed, that she makes enough money to support A.H.

10

and herself, and that she completed most of the service-plan requirements. Mother also argues that Duirden-Jones's assessment of the stability of her home was based on visits that occurred months before the termination and emphasizes that there was no evidence of any of Father's belongings being in her new home after the September 2020 visit. Furthermore, Mother highlights that no physician, therapist, guardian, or attorney ad litem testified at the hearing and that Duirden-Jones did not specifically testify about A.H.'s best interest. In light of the preceding, Mother contends that the evidence was legally and factually insufficient to support the trial court's best-interest determination.

In this case, although Mother testified that A.H.'s misconduct resulted from their separation and that A.H. wanted to return home and although evidence was presented showing that the visits between them went well, there is no direct evidence of A.H.'s desires regarding her future placement. The trial court may have considered the child's young age at the time of the de novo hearing as it pertained to the child's ability to express any placement desires. However, when deciding that termination is in a child's best interest, the trial court need not have evidence of all the *Holley* factors. *See id.*; *see also In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.) (explaining that child's love of his parent is important consideration but cannot override overwhelming evidence showing parent engaged in conduct and placed child in conditions endangering his physical and emotional well-being).

Moreover, Mother did not challenge the findings that she knowingly placed A.H. in conditions and engaged in conduct that endangered A.H.'s well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *see also In re G.S.*, No. 14-14-00477-CV, 2014 WL 4699480, at *12 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.) ("The unchallenged predicate findings under section 161.001(1)(E), endangering conduct, are binding and may be

11

considered as evidence related to the court's best interest finding"). Further, evidence was presented during the hearing demonstrating that Mother had been in a long-term abusive relationship, that the abuse was "very severe," that A.H. was present when the abuse occurred and witnessed "a lot of" abuse between her parents, and that the abuse continued during the pendency of this case. Mother also testified that A.H.'s witnessing the abuse hurt her, and the Department's final report documented that Father taught A.H. how to engage in acts of self-harm. *See In re S.K.A.*, 236 S.W.3d 875, 903 (Tex. App.—Texarkana 2007, pet. denied) (explaining that history of abuse in child's family is relevant to best-interest determination).

Additionally, evidence was presented establishing that Mother used multiple drugs near the time of removal, told a Department employee that she had used methamphetamine with Father in the home while A.H. lived there, associated with individuals who use illegal drugs after A.H. was removed, and tested positive for cocaine in January 2021, which was after A.H. had been removed from her custody and just a few months before Mother's rights were terminated. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (noting that parental drug use is relevant to best-interest determination); *see also In re M.A.J.*, 612 S.W.3d 398, 407-08 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (determining that evidence of positive drug tests after receiving referral that parent used narcotics was sufficient to support finding of endangerment); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (explaining that evidence that parent engaged in drug use during pendency of termination suit when parent is at risk of losing child is sufficient evidence to support endangerment finding); *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (noting that evidence of "continued drug use

. . . demonstrates an inability to provide a stable environment for [child] and an inability to provide for his emotional and physical needs").

In her testimony, Mother did deny that termination of her parental rights was in A.H.'s best interest, but she did not provide additional support for that assertion. Although Mother testified that she tested positive for cocaine because she was in close contact with someone who used cocaine, the trial court was charged with making credibility determinations and with resolving conflicts in the evidence. *See In re A.B.*, 437 S.W.3d at 503; *see also In re K.M.R.*, No. 14-17-00651-CV, 2018 WL 614762, at \*12 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, pet. denied) (mem. op.) ("As sole arbiter of credibility and demeanor, the trial court was free to credit positive test results over Father's denial of cocaine use"). Similarly, although Mother testified that she did not plan to become romantically involved again with Father, that she continued communicating with Father only to establish a co-parenting relationship, and that she had no more involvement with Father after September 2020, the trial court had to weigh the credibility of that testimony. *Cf. In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at \*6 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.) (noting that factfinder is in best position to assess credibility of parent's excuses).

When assessing Mother's credibility, the trial court could have considered evidence that Mother attempted to conceal her ongoing relationship with Father after a protective order had been issued and indicated that she believed she did not have a choice but to continue the relationship; attempted to rekindle the relationship and live with Father in June 2020, which resulted in her being injured and his being arrested for assaulting her; requested that the charges against Father be dropped; continued to communicate with Father after A.H. was removed; labeled Father as "My Hubby" in her phone; and had Father's clothing hanging in a closet in her

13

new home even though she had not fully unpacked her own belongings. In addition, the trial court was also presented with evidence showing that Father was in jail for much of the time in which Mother claimed that they were no longer involved and admitted that she visited him in jail at least three times around the time that the associate judge recommended terminating her parental rights. *Cf. In re J.A.M.*, No. 14-18-00528-CV, 2018 WL 6217376, at *9 (Tex. App.—Houston [14th Dist.] Nov. 29, 2018, pet. denied) (mem. op.) (noting that there was conflicting evidence regarding mother's continued involvement with abusive partner and that "[a] fact finder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness to meet the children's needs in the future").

Moreover, although Mother correctly points out that she complied with many of the terms of her service plan, was employed, testified that she earned enough money to provide for A.H. and herself, and moved into a clean home with room for A.H., "evidence of improved conduct . . . does not conclusively negate the probative value of a long history of . . . irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Additionally, even though the substance-abuse assessment initially indicated that no additional treatment was necessary, Mother subsequently tested positive for cocaine use. *Cf. In re M.G.D.*, 108 S.W.3d 508, 513, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (explaining that "evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue" and noting that narcotics abuse issues "sometimes reappear").

Further, even though the final report by the Department stated that the visits between Mother and A.H. went well and that Mother provided snacks and activities, Duirden-Jones testified that Mother treated A.H. like a friend and would allow her to do whatever she wanted. Regarding the Department's plans, Duirden-Jones testified that A.H. was recently

14

placed with a foster family who wants to adopt her. *Cf. Hann v. Texas Dep't of Protective & Regul. Servs.*, 969 S.W.2d 77, 83 (Tex. App.—El Paso 1998, pet. denied) (observing that "establishing a stable, permanent home for a child is a compelling interest for the government"), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002). Although Duirden-Jones stated that A.H. had begun exhibiting behavioral issues, she also explained that A.H. is being treated for those issues and that the Department will be able to transition A.H. to a forever home. Even though Duirden-Jones did not specifically state that termination was in A.H.'s best interest, she testified regarding, among other things, Mother's prior drug use and the history of domestic abuse in the family, which was witnessed by A.H., and testified that the Department recommended that Mother's rights be terminated. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (explaining that factfinder may make inferences from past conduct endangering well-being of child when making best-interest determination).

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of Mother's parental rights is in A.H.'s best interest. In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights is in A.H.'s best interest. Accordingly, after considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in A.H.'s best interest.

For these reasons, we overrule Mother's issue on appeal.

15

## CONCLUSION

Having overruled Mother's sole issue on appeal, we affirm the trial court's de novo decree terminating Mother's parental rights.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   November 18, 2021